1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10  RAIN DICKEY-O'BRIEN

11              Petitioner,              No. 2:07-cv-1241 WBS CKD P

12        vs.

13   JAMES A . YATES

14              Respondent.             FINDINGS AND RECOMMENDATIONS

15  _____/

16              Petitioner is a state prisoner proceeding pro se with an application for writ of

17  habeas corpus under 28 U.S.C. § 2254.  Petitioner was convicted in the Superior Court of Plumas

18  County, California, of murdering and robbing Mark Gerald Levitoff, an employee of the U.S.

19  Forest Service who, while off-duty, stopped to help petitioner with apparent car trouble on

20  January 20, 2000.  Petitioner pled not guilty by reason of insanity.  The Superior Court initially

21  found he was not competent to stand trial, and he was admitted to Atascadero State Hospital on

22  February 5, 2002.

23              On May 1, 2002, the medical director at Atascadero certified that petitioner's

24  treatment and medication had restored his competence to stand trial.  He was returned to Plumas

25  County on May 5.  In a plea colloquy before the Superior Court on November 19, 2002,

26  petitioner admitted that he shot Levitoff and took his wallet, but he preserved his defense that he

1

1  was insane, and therefore not guilty, at the time he committed those acts.

2  Immediately after the court accepted petitioner's plea, a trial commenced on the

3  question of petitioner's sanity at the time he killed Levitoff.  The jury heard three psychological

4  experts testify on the subject, along with numerous fact witnesses.  After deliberating for

5  approximately a day-and-a-half, the jury returned its verdict on January 16, 2003, finding that

6  petitioner was sane when he committed the admitted acts.  On February 13, 2003, the Superior

7  Court sentenced petitioner to life in prison without the possibility of parole for the murder

8  conviction, to a concurrent term of twenty-five years to life on a weapons enhancement, and to

9  three years for robbery.

10  Now petitioner seeks federal habeas relief on two claims: (1) that the Superior

11  Court violated his right to due process when it failed to hold a competency hearing despite

12  substantial evidence that he was not competent to stand trial, and (2) that the Superior Court gave

13  the jury an unconstitutional instruction on deciding the question of petitioner's sanity.

14  Respondent has answered the amended petition, and petitioner has filed a traverse.

15  I.  Factual background

16  For much of his life prior to January 2000, petitioner was treated with various

17  medications, including anti-psychotics, for severe manifestations of mental illness.  He described

18  his behavior and mental state during the months leading up to the killing to the experts who

19  testified at his trial and summarized what he told them in his opening brief on direct appeal:

20  [W]hen he ran out of money in 1999, he stopped seeing his
   doctor [in Albuquerque, New Mexico].  He stopped taking his
21  medicine, believing he'd be fine if he just exercised and led a good
   life, even though his doctor warned he'd get sick again if he did
22  that.

23  Over the next several months, [he] became isolated, and
   had thoughts (delusions) of cameras in the ventilating system and
24  neighbors tapping his phone.  He was also told by voices that
   people were trying to steal his thoughts.  As a result, [he] became
25  fearful and had destructive fantasies, which he dealt with by buying
   magazines having to do with killing. (It was later stipulated that
26  gun magazines were found in his apartment after his arrest.)  Drs.

2

Globus and Howle explained that voices in a delusional person's mind have an internal reality and authoritativeness much more vivid and compelling than the voice of any actual person.

Eventually, [petitioner] said, voices told him to leave Albuquerque and go to Yellowstone, to avoid community and technology so that no one could find him.  He didn't know Yellowstone was closed and hadn't tried to find out.

[He] continued his odyssey through the western states, still trying to avoid community and technology.  He believed people were following him, and the experts all agreed his behavior was consistent with trying to escape surveillance perceived in paranoid delusions.  Appellant was also having ongoing hallucinations in which he heard voices saying negative things about him. ...

[He] told the sanity experts that just before the homicide, his car was having a battery problem and also was smoking and generally not functioning well, so he pulled to the side of the road.  A Forest Service employee stopped and offered to jump his battery, but he didn't need it.  He then went back to his car, got a shotgun, and told the man to stand against a tree so he could shoot him.  The man threw his wallet toward [him] and told him to take it, then ran in the other direction, got about 80 feet away, but slipped and fell in the snow.  Appellant chased him as he ran, shot him in the head and killed him.

[He] told Dr. Howle that after the man stopped to help him, voices told him the man was a demon, and from that [he] came to believe the demon was posing as a CIA agent who would "brainwash me and have control over me and turn me into a zombie."  He told Dr. Globus the voice said the man was a "f___ing demon" who was going to take his soul.  He also reported to Dr. Thomson that the demon was in one of the cars following him, and would follow him again unless he killed it.

Lodged Doc. 1 at 20-22.[1]  Petitioner "didn't report hearing any hallucinations or voices after he killed Levitoff.  He said he took Levitoff's wallet off the ground for the money, not due to any delusions."  Id. at 22.

////

////

////

---

[1] Wherever applicable, the court refers to page numbers assigned by its CM/ECF electronic docketing system

1   On January 22, 2000, Levitoff's body was discovered in the snow near Lake

2   Almanor in Plumas County, California.  CT 3.[2]  He had been shot with a shotgun in the head and

3   through the hand with his shoulder up, suggesting a defensive position.  RT 2:429.  His pickup

4   truck was approximately ninety yards from his body.  Id. at 430.  The hood was open and jumper

5   cables were attached to the battery.  Id.  An autopsy determined that Levitoff had died two days

6   earlier, on January 20.  Id. at 429.

7   After the crime was discovered, law enforcement authorities learned that on

8   January 21, 2000, someone had bought a car battery in Elko, Nevada, using Levitoff's credit

9   card.  RT 4:953.  "Upon learning that Levitoff's credit and debit cards were being used, the

10  prosecutor asked that the accounts remain open for tracking purposes."  Respondent's Brief on

11  Direct Appeal (Lodged Doc. 2) at 10.  There were several more transactions and attempted

12  transactions with Levitoff's cards until January 24, when a U.S. Forest Service official located

13  petitioner at a camping ground in Daggett County, Utah.  RT 2:556-57, 560-61; 3:606, 632.

14  When authorities approached petitioner at the campground, they found him in possession of

15  Levitoff's credit cards.  RT 3:633.  They also found a sawed-off 12-gauge shotgun with the stock

16  cut down and serial number obliterated.  RT 2:430.

17  Petitioner was arrested at the campground and taken to the Daggett County Jail.

18  He waived extradition to Plumas County, California, on June 30, 2000, and was arraigned in

19  Superior Court there on July 24, 2000.  (CT 6, 13.)

20  ////

21  

22  [2] The state court record is more than four thousand pages long, which respondent has
divided into at least seventeen separate lodged documents.  See Docket No. 28, Notice of
Lodging Paper Documents.  The parties did not use the same abbreviations of reference to the

23  record in their briefing arguments, creating considerable confusion for the court.  The court uses
the following abbreviations in referring to the record: CT for Clerk's Transcript (Lodged Doc.

24  13); CST for Clerk's Supplemental Transcript (Lodged Doc. 14); RT for Reporter's Transcript
(Lodged Doc 15); SRT for Supplemental Reporter's Transcript (Lodged Doc 16); ART for

25  Augmented Reporter's Transcript (Lodged Doc 17); and SCT for Sealed Clerk's Transcript.
Where a lodged document has been filed in multiple volumes, the court uses the applicable

26  abbreviation followed by the volume number, a colon and the page number(s), e.g., RT 5:1412.

II.   Proceedings in Plumas County Superior Court

Petitioner entered a plea of not guilty by reason of insanity on February 28, 2001. CT 68.  Petitioner's defense counsel, Janet Hilde, retained Dr. Bruce W. Ebert, a licensed psychologist, to evaluate petitioner and ascertain whether an insanity defense would be viable. SCT at 2.  Dr. Ebert met with petitioner on September 6, 2001.  Id. at 1.  He later wrote in his report that during the examination, "it became clear to me that there was a distinct competency issue that had to be dealt with prior to any trial[.]"  Id. at 2.  Dr. Ebert thus "altered" his evaluation to ascertain petitioner's competence to stand trial.  Id.  He reported to Hilde that petitioner's "thinking is so bizarre and distorted that his conscious existence is in a world of delusions, fantasy and anger," his "competence is eclipsed by paranoid delusions," and his ability to cooperate rationally with counsel "is extremely impaired.  It is this major factor that makes Rain not competent to stand trial."  Id. at 7-8.  Dr. Ebert concluded that petitioner, whom he found "very intelligent" and "fully aware of the charges against him," was "not currently able [to] assist counsel in a rational manner in his defense.  This defendant is not competent to stand trial." Id. at 6, 12.

Attorney Hilde presented the Superior Court with a copy of Dr. Ebert's evaluation on October 2, 2001.  She told the court that petitioner had expressed to her his opposition to a continuance or other delay of trial but that "I believe he's mentally incompetent based on Dr. Ebert's report."  SRT 2:322.  The court responded that it had "no alternative but to exercise a doubt as to Mr. Dickey-O'Brien's competency at this time, and therefore the criminal proceedings will be suspended."  Id. at 324.  The court's finding that it had "no alternative" but to stay proceedings was a reference to California Penal Code § 1368(c), which states that, once defense counsel informs the court she believes the defendant is incompetent, "the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined."  Cal. Penal Code § 1368(c).

////

1        The Superior Court held a competency hearing on December 17, 2001.  The court

2  received the Ebert report and two other experts' assessments of petitioner's competence, one

3  from each party, into evidence.  See ART 1:18 (Lodged Doc. 17); CT 2:302.  One of them, Dr.

4  Eugene P. Roeder, researched petitioner's psychological records and found "a chronic history of

5  severe mental disturbance dating back to at least when he was ten years old."  SCT at 13, 20.

6  The other, Dr. Laura S. Morrison, found that at age ten or eleven petitioner was placed in a foster

7  home after he reported severe physical abuse by his father.  See SCT at 21.  Less than two

8  months later, however,

9              he was hospitalized in an acute-care children's in-patient
           psychiatric hospital, where he remained for six months.  He was
10             initially hospitalized for severe behavior problems, depression, and
           auditory hallucinations.  However, he told his doctors shortly after
11             admission that his hallucinations had gone away within a few days,
           so that he was only diagnosed with depression.  He apparently
12             alternated between group home placements, foster homes, and
           hospitalizations for the next few years; usually his diagnoses were
13             depressions, although at times antipsychotic medication and mood
           stabilizers (anti-manic medications) were prescribed for him. ...
14             [A]s he approached adulthood he apparently began to
           decompensate, and the records indicate an increase in psychotic
15             symptoms. ... [By age 19] he was diagnosed as Bipolar Disorder,
           Mixed, and was taking mood stabilizers and antidepressants. ... He
16             stated that at the time of his arrest, he had not been on any
           psychiatric medications for about a year.

17

18  Id. at 22.  Dr. Morrison's diagnostic impression of petitioner was "Schizoaffective Disorder" and

19  "Bipolar I Disorder, severe with psychotic features."  Id. at 24.  She, like the other two experts,

20  concluded that petitioner was "not able to assist in his own defense in any kind of consistent

21  way."  Id. at 25; see also SCT at 20 (containing Dr. Roeder's opinion that petitioner "is presently

22  not capable of assisting his defense counsel is conducting a defense, and similarly, he is not able

23  to conduct his own defense in a rational manner").

24        Petitioner waived the right to have his competence decided by a jury, and the

25  question was submitted solely on the basis of the three experts' reports, with neither side

26  presenting additional evidence or testimony.  Id.; ART 1:14, 17-19.  The court found that all

three psychological experts "agree that Defendant is able to understand the nature of the

proceedings pending against him... but they all express the opinion that because of his

psychological condition he cannot appropriately cooperate with counsel and assist counsel in the

preparation and presentation of a defense.  Therefore, the Court makes the finding that, at this

time, the Defendant is incompetent to go to trial." Id. at 20.  On January 8, 2002, the court

ordered petitioner into confinement at Atascadero State Hospital or a private treatment facility

"until such time as his mental competence can be restored." CT 2:316.

On May 1, 2002, Dr. Robert Knapp, medical director of Atascadero State

Hospital, wrote the Superior Court that petitioner "is now able to understand the nature of the

proceedings against him and to cooperate rationally with an attorney in his defense." CT 2:321.

Dr. Knapp advised the court of his "opinion that this defendant probably does need placement in

a psychiatric facility in order to maintain competence to stand trial." Id.  Atascadero also sent the

Superior Court an eight-page evaluation from Dr. Beth A. Lawhead, a report "designed to

provide data about [petitioner's] competence." SCT 32.  It described petitioner as having "quite

a complicated and prominent delusional system with paranoid, grandiose, and bizarre delusions."

Id. at 38-39.  The report recommended that "[h]e should remain under the care of a psychiatrist"

and that he should "[r]eturn to court... on psychotropic medications and in need of alternate

mental health placement while awaiting trial." Id. at 39-40.  According to the report, petitioner

was receiving Olanzapine, Wellbutrin and Depakote at the time he was released to stand trial. Id.

at 40.

Petitioner's first appearance before the Superior Court after his certification of

competence was on May 14, 2002.  The court advised his counsel that he could still have a

hearing on competence, but she replied that "at this point today we don't wish to challenge the

finding of competency." ART 1:31.  The court then began a detailed review of Atascadero's

recommendations for maintaining petitioner's competency to stand trial.  The court referenced

California Penal Code § 1372(e), which allows a trial court to place a defendant who has been

restored to competency in an "appropriate secure facility approved by [inter alia] the county

mental health director[.]"  The Superior Court judge stated that

> . . . I contacted Vonn Sebold, who is our mental health
> director, to determine where the appropriate place to house him in
> terms of whether or not that should be the county jail or we have to
> make arrangements at another – at a psychiatric hospital or some
> other type of facility.

> . . . It was Mr. Sebold's position that Mr. O'Brien could be
> housed at the county jail, that he would make sure that he was seen
> by the mental health department and also seen by a psychiatrist,
> and that he would assist in making sure that Mr. O'Brien took the
> appropriate medication.

> . . .

> And based on that, I intend to house Mr. O'Brien at the
> county jail until such time as it's determined that that may be
> inappropriate or not.  And then we'll meet that hurdle when we get
> there.

ART 1:34.  The judge further ordered that petitioner be seen by a psychiatrist and receive the

recommended medications "until a psychiatrist or other doctor says it's inappropriate."  Id. at 35.

He noted Atascadero's recommendation that petitioner's reactions to the drugs be monitored and

said "if that's not working, then we need to place him in the appropriate location."  Id.  And with

that, the Superior Court re-instituted criminal proceedings against the petitioner.  Id. at 36.

On June 17, 2002, the court appointed Dr. Captane P. Thomson, a psychiatrist

suggested by the prosecution, to examine petitioner and render an opinion as to his sanity at the

time he killed Levitoff.  CT 2:339, 342.  A week later, the court appointed defense counsel's

suggested psychiatrist, Dr. Albert Globus, for the same purpose.  Id. at 345, 348.

On July 25, 2002, Dr. Globus wrote defense counsel with his concerns after his

first interview with petitioner.  He said he was "alarmed due to the seriousness of [petitioner's]

psychiatric condition and the nature of the psychiatric care he is receiving."  First Am. Pet. at

147.  On August 1, 2002, defense counsel discussed Dr. Globus' letter with the Superior Court

judge ex parte in a closed session.  See SRT 2:338-39.

On November 19, 2002, petitioner changed his plea to "guilty" for the acts charged while preserving his insanity defense.  See 2 SRT 2:448-477.  The court held a lengthy colloquy with the petitioner and his counsel, which included the following:

> THE COURT:  . . . This is a rather different type of plea that we normally see for two reasons: one is because of the severity, the gravity of what you're pleading to; and secondly, because of your previous – you were declared incompetent some time ago and I need to be assured that you understand what's going on here today.
>
> . . .
>
> Ms. Hilde, you have been representing Mr. O'Brien for some time; is that correct?
>
> MS. HILDE:  Yes.
>
> THE COURT:  Do you have any doubt in your mind that he understands what he's doing here today?
>
> MS. HILDE:  I have no doubt.
>
> THE COURT:  When was the last time he saw a psychologist or psychiatrist, without getting involved with who or anything like that.  Has he seen a psychiatrist recently?
>
> MS. HILDE:  On Friday, last Friday, yes.
>
> THE COURT:  Without revealing what they said, did they indicate to you any doubt whatsoever regarding your client's competency?
>
> MS. HILDE:  No.
>
> THE COURT:  So at this time you're satisfied that he is competent as outlined in the law and he understands what's going on here today?
>
> MS. HILDE:  Yes, I am certain.
>
> THE COURT:  Mr. O'Brien, let me talk to you now.
>
> . . .
>
> Could you tell me what medications you're currently taking today?
>
> THE DEFENDANT:  Zyprexa, Trileptal, and Wellbutrin.
>
> THE COURT:  Now, have you taken those medications today?

/////

1    THE DEFENDANT:  Yes.

2    . . .

3    THE COURT:   Do you know what your dosage is –

4    THE DEFENDANT:   No, I don't.

5    THE COURT:   – on those medications?

6    THE DEFENDANT:   No.

7    THE COURT:   Has your dosage changed since you've been brought back from the state hospital?

8

9    THE DEFENDANT:   No, your Honor.

10    THE COURT:   So you're taking the same dose of the same medication.

11    THE DEFENDANT:   Yes.

12    . . .

13    THE COURT:   Now, the medication that you've told me about, the three prescriptions that you've taken so far today, has it in any way affected your ability to understand what is happening here today and in any way affect your ability to enter this plea?

14

15    THE DEFENDANT:   No.

16    THE COURT:   There was a hesitation so let me inquire about that. You're taking medication.

17

18    THE DEFENDANT:   Right.

19    THE COURT:   Does it affect you in any way? Does it make you feel tired, drowsy, sleepy?

20    THE DEFENDANT:   Well, it makes me drowsy.

21

22    THE COURT:   Okay.  Does it affect your ability to – I've watched you over the last few weeks, and although I haven't seen you all the time, I do look at you because I look at the audience and I have not noticed you sleeping, I have not noticed you with your eyes closed.  I've noticed you talking to your counsel and I have no idea what you've said, but as far as I'm concerned just based on my observations of you, I have not noticed anything out of the ordinary, okay?

23

24

25

26    During the last couple of weeks, have you had any trouble paying attention to what's going on here?

10

THE DEFENDANT:  No.

THE COURT:   Other than feeling drowsy, does the medication affect you in any way?

THE DEFENDANT:  Well, it affects me.  It makes me better.

THE COURT:   Okay.  No, it affects you – in other words, I'm just thinking, does it give you a dry mouth, does it affect your vision, affect your hearing, affect your ability to understand what's going on?

THE DEFENDANT:   There are a few side effects but nothing that would interfere with my ability to comprehend the proceedings.

THE COURT:   What are those side effects, Mr. O'Brien?

THE DEFENDANT:   Dry mouth, kind of like a spacey-headed feeling.

THE COURT: I'm sorry?

THE DEFENDANT:   Kind of a – I don't know how to explain it, kind of a spacey feeling.

THE COURT:   Do you think that interferes with your ability to understand what's going on?

THE DEFENDANT:  No.

THE COURT:   So what I'm hearing from you, Mr. O'Brien, although you're on medication, you feel – you understand what's going on here today.

THE DEFENDANT:  Yes.

THE COURT:   And you have no problems understanding what's going on here today?

THE DEFENDANT:  No.

THE COURT:   Okay.  And if at any time during the course of our discussion here this afternoon if you don't understand, will you so indicate?

THE DEFENDANT:  Yes.

Id. at 451-55.

////

From there, the court discussed with petitioner and his counsel "the crimes and the consequences," meaning the elements of the charged offenses and the sentences that petitioner would receive if he pled guilty and was found to have been sane when he committed them.  Id. at 456.  The court advised petitioner of his constitutional rights to trial by jury, to cross-examine witnesses, to remain silent against self-incrimination, to testify on his own behalf and to present evidence and testimony in his defense.  Id. at 464-66.  Petitioner acknowledged that he waived those rights.  Then he pled guilty to each count.  Id. at 471-73.

After taking the pleas, the court entered these findings:

> . . . [J]ust for the record so there's no misunderstanding, I've had a discussion with Mr. O'Brien.  I've had a chance to observe him today and over the past few weeks.  I find that Mr. O'Brien – I feel that Mr. O'Brien understands what we've talked about.  I have not noticed any problems with him understanding me.  He is looking at me, he is making eye contact.
>
> I have watched him.  I have no doubt in my mind that he understands what we're talking about.  He is a very intelligent young man and I don't feel that he's had any difficulties, nor does the medication seem to be – nor does the medication appear to be interfering with his thought processes.  I think he is cogent, he is paying attention, and I feel that he has followed our conversation and discussion very well, so I would find there is a factual basis for the plea[.]
>
> . . .
>
> Again I think that Mr. O'Brien is well aware what's going on here today and I will find there is a factual basis for the plea.  I further find that the plea and the waivers were made knowingly, intelligently, and voluntarily and expressly.  I accept and approve the plea.  I find the admitted allegation to be true.

Id. at 474-45.

At trial, the jury heard from three psychological experts. Two of them opined that petitioner met one or both of the tests of legal insanity, as that status was defined in the instruction the jury received.  See Testimony of Dr. Jerry Howle, RT 2:447-52; Testimony of Dr. Albert Globus, RT 3:678-92.  The other opined that petitioner did not meet the criteria for an insanity defense.  See Testimony of Dr. Captane Thomson, RT 4:1013 (Lodged Doc. 15).  The

jury also heard from numerous fact witnesses.  Petitioner did not testify, and his demeanor in the

courtroom was, as the prosecutor described it to the trial judge, "motionless and mute."  Id. at

999.  However, there is one vague indication that in late December or early January, several

weeks into trial, petitioner experienced "difficulties" that gave counsel "concerns ... about Mr.

O'Brien."  Id. at 997.[3]  Neither the record nor any argument to this court has clarified the basis of

those concerns or specified what the court described as petitioner's "difficulties."

On January 16, 2003, the jury returned its verdict, declaring the petitioner sane at

the time he robbed and killed Mark Levitoff.  RT 5:1412-16.  Petitioner appealed.  On November

28, 2005, the California Court of Appeal for the Third Appellate District affirmed the conviction.

See Lodged Doc. 4.  It found that "[t]he record does not contain substantial evidence defendant

was incompetent during the November 19 plea colloquy or any time after reinitiating criminal

proceedings and before judgment."  Id. at 15.  Petitioner filed a petition for review with the

California Supreme Court on January 11, 2006.  See Lodged Doc. 5.  It was denied without

comment on March 22, 2006.  See Lodged Doc. 6.

III.   Petitioner's state habeas process

Petitioner started his state habeas process with a petition to the Superior Court of

Plumas County on May 9, 2007.  See Lodged Doc. 7.  He claimed that the trial court had violated

the Due Process Clause when it did not hold a competency hearing "in light of the court's

November 19, 2002 [change-of-plea] colloquy, Atascadero's restoration report, the court's own

antipsychotic drug order, and the prior finding of incompetence."  Id. at 13.  He argued that these

and other factors known to the trial judge constituted "several indicia of incompetence that,

combined with the prior finding of incompetence, raised a bona fide doubt that required a

suspension of proceeding and a competency hearing."  Id.  Petitioner also argued that the trial

---

[3] "[L]ast week" is the most specific timing given for petitioner's "difficulties."  Id.  The brief exchange happened on January 7, 2003; thus this court can only approximate that the trial judge was referring back to late December or earlier in January.  Id.  The transcript does not say which lawyer he was addressing.

court's instruction to the jury on his insanity defense violated the Fifth, Sixth and Fourteenth Amendments.  Id. at 11-12.

The Superior Court rejected petitioner's habeas claim that the trial judge should have held a competency hearing.  The court found first that the claim was untimely under In re Robbins, 18 Cal.4th 770 (1998), and In re Clark, 5 Cal.4th 750 (1993), and that it was barred under In re Waltreus, 62 Cal.2d 218 (1965).[4]  See Lodged Doc. 8 at 5-6.  However, the court included a short, alternative basis of denial in its order, finding that petitioner had failed to attach transcript excerpts to support his claim that the prosecutor had commented on his "motionless and mute" demeanor.  Id. at 6.  The court concluded that "regardless, it is presumed that the Third District Court of Appeal considered this and any other matter contained in the record, in determining petitioner's competency claim on appeal. ... [T]he court [does not] see any reason to conclude any differently than did the Third District Court of Appeal on this claim."  Id.

Petitioner then took his state habeas claims to the Court of Appeal, submitting a petition attached with excerpted testimony by the experts who gave their opinions at trial.  See Lodged Doc. 9.  The court issued a one-sentence denial, stating that the petition was denied "on the merits."  Lodged Doc. 10.  The order included no citation to Robbins, Clark, or Waltreus, or to any other case that represents a procedural bar to state habeas review.

Petitioner's last attempt at state habeas relief also failed.  His petition to the California Supreme Court was unaccompanied by any documentary evidence or excerpts from the trial transcript.  Instead, petitioner submitted only the Court of Appeal's opinion denying his direct appeal.  See Lodged Doc. 11.  In its order, the California Supreme Court wrote simply that the petition was "denied," with no case citations and no reference to the merits of the case.  Lodged Doc. 12.

---

[4] Waltreus holds that issues already raised and denied on direct appeal cannot be raised anew in state habeas proceedings.  See Waltreus, 62 Cal.2d at 225; Carter v. Giurbino, 385 F.3d 1194, 1198 (9th Cir. 2004).

IV.  AEDPA standards

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "AEDPA").[5]  The habeas petitioner carries the burden of showing he is not precluded from obtaining relief under § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).  That is, AEDPA stands as a "precondition to federal habeas relief, not an entitlement to it."  Fry v. Pliler, 551 U.S. 112, 119 (2007).

Two relatively recent decisions by the Supreme Court – Harrington v. Richter, — U.S. —, 131 S. Ct. 770 (2011), and Cullen v. Pinholster, — U.S. —, 131 S. Ct. 1388, 1398 (2011) – present this court with two important procedural questions for properly applying AEDPA in this case: (1) which state court decision does the court analyze under § 2254(d), and (2) which parts of the state court record are appropriate to review in conducting that analysis?  The questions are not unrelated.

A.  Effect of Richter: Which state court decision is subject to § 2254(d)?

In Richter, the U.S. Supreme Court addressed the California Supreme Court's summary denial of a habeas petitioner's federal claims.  As is often the case in California's habeas process, the California court issued its denial without stating any grounds or reason for its decision.  The U.S. Supreme Court held that "[w]hen a federal claim has been presented to a state

---

[5]  AEDPA is the acronym for the Anti-terrorism and Effective Death Penalty Act, codified at Title 28 U.S.C. § 2254(d).

1  court and the state court has denied relief, it may be presumed that the state court adjudicated the

2  claim on the merits in the absence of any indication or state-law procedural principles to the

3  contrary." <u>Richter</u>, 131 S. Ct. at 784-85.

4         In <u>Cannedy v. Adams</u>, No. 09-56902, — F.3d —, 2013 WL 452827 at *9 (C.A.9

5  (Cal.) Feb. 7, 2013), the Ninth Circuit reaffirmed the practice of "looking through" a summary

6  habeas decision in state court to the last reasoned decision, as required by the Supreme Court in

7  <u>Ylst v. Nunemaker</u>, 501 U.S. 797, 806 (1991).[6]  In this case, identifying the right judicial

8  decision for AEDPA review takes a few steps.  First, the Court of Appeal's order denying

9  petitioner's state habeas claims says simply that the court's decision was "on the merits."  That

10 statement stands out for its exclusion of any procedural citations, in contrast to the Superior

11 Court's principal finding that the state habeas petition was procedurally barred under

12 <u>Robbins</u>/<u>Clark</u> and <u>Waltreus</u>.  This court presumes the exclusion was intentional: the rationale in

13 <u>Ylst</u> that "silence implies consent, not the opposite – and courts generally behave accordingly,

14 affirming without further discussion when they agree, not disagree, with the reasons given

15 below," <u>Ylst</u>, 501 U.S. at 804 – must apply with equal force where the exclusion of one of the

16 lower court's two stated reasons implies a rejection of that reason.  In this case, that means the

17 Court of Appeal rejected the Superior Court's procedural rulings and affirmed the Superior

18 Court's decision on the merits.

19        The Court of Appeal's inclusion of the phrase "on the merits" in its order thus

20 leaves the Superior Court's alternative finding that it did not "see any reason to conclude any

21 differently than did the Third District Court of Appeal on [the competency] claim" as the only

22

23        [6] This reaffirmation of the "look through" doctrine was in response to <u>Williams v.
   Cavazos</u>, 646 F.3d 626 (9th Cir.2011), <u>rev'd</u> on <u>other</u> <u>grounds</u> <u>sub</u> <u>nom</u>. <u>Johnson v. Williams</u>, —
24 S. Ct. —, 2013 WL 610199 (U.S.).  There, the Ninth Circuit said that it would "continue to
   adhere to that practice, at least with respect to cases in which state courts of last resort have
25 exercised their discretionary authority to deny petitions for review" – implying, perhaps, that
   after <u>Richter</u> the look-through doctrine no longer applies in places like California, where
26 consideration of habeas petitions in state courts is not discretionary.  <u>Id.</u> at 635-36.  That
   suggestion has been, for now, disavowed.

1  "reasoned" decision rendered in petitioner's entire state habeas process.  The Superior Court did

2  not elaborate on why it was satisfied with the Court of Appeal's decision on direct appeal – and

3  for purposes of this court's AEDPA review, the Superior Court did not have to: it is well

4  established that if the last reasoned state court decision adopts or substantially incorporates the

5  reasoning from a previous state court decision, a federal habeas court may consider both

6  decisions to ascertain the reasoning of the last decision.  See Edwards v. Lamarque, 475 F.3d

7  1121, 1126 (9th Cir. 2007) (en banc).  It makes no difference that the underlying decision that

8  provides the rationale for denial was rendered on direct review.  See, e.g., Her v. Jacquez, 2011

9  WL 1466868 at *9 (E.D.Cal. April 18, 2011) (stating that "in this case, the last clear[ly]

10  explained decision... is from the California Court of Appeal's decision on direct appeal, which

11  denied the claim on the merits").  Therefore, this court must analyze the Court of Appeal's

12  reasoned decision on direct appeal to determine if petitioner passes any of the thresholds set by §

13  2254(d).

14      B.  Effect of Pinholster: Which parts of the record?

15          When a state habeas court reaches a decision on the merits but provides no

16  reasoning to support its conclusion, a federal habeas court independently reviews the record to

17  determine whether relief is available under § 2254(d).  See Himes v. Thompson, 336 F.3d 848,

18  853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  However, federal

19  review of the record, while independent, is not unlimited.  Instead, "review under § 2254(d)(1) is

20  limited to the record that was before the state court that adjudicated the claim on the merits."[7]

21  Pinholster,131 S. Ct. at 1398.  To comply with Pinholster, then, a federal habeas court must

22  ascertain the contents of the record that was in front of the state court before the federal court

23  undertakes a review of the state court's decision.  See id. at 1402 n.12.

24

25          [7] Unlike § 2254(d)(1), in which the Court found an unwritten limitation to federal review,
    § 2254(d)(2) expressly limits review under that provision to "evidence presented in the State
26  court proceeding."

1    <u>Richter</u>'s holding is significant to that task insofar as it means the California

2    Supreme Court's summary denial of this petitioner's habeas claims could not have been on the

3    procedural ground that petitioner failed to include reasonably available documentary evidence or

4    relevant excerpts of the trial transcript – a ground given by the Plumas County Superior Court.

5    The California Supreme Court did not expressly state it denied the habeas petition "on the

6    merits," as did the intermediate Court of Appeal, but it did not rely on any of the commonly cited

7    California cases that indicate a procedural deficiency, either.  Most importantly, the California

8    Supreme Court did not cite to <u>People v. Duvall</u>, 9 Cal. 4th 464 (1995).  A citation to <u>Duvall</u>

9    usually means that a state habeas petitioner has failed to meet either or both of two pleading

10   requirements: "[t]he petition should ... (i) state fully and with particularity the facts on which

11   relief is sought, as well as (ii) include copies of reasonably available documentary evidence

12   supporting the claim, including pertinent portions of trial transcripts and affidavits or

13   declarations."  <u>Id.</u> at 474; <u>see also</u> <u>McClendon v. Yates</u>, 2011 WL 6057001 at *13 n.6 (Sept. 19,

14   2011, C.D.Cal.) (noting that "[t]he <u>Duvall</u> citation [stands] for the proposition that Petitioner

15   failed to comply with the [pleading] requirement[s] ... and thus, the <u>Duvall</u> citation reflects the

16   imposition of a procedural bar, rather than a merits disposition").   <u>Richter's</u> presumption that

17   petitioner lost in the California Supreme Court on the merits means that he was not denied relief

18   for failing to meet either of <u>Duval</u>'s pleading requirements.  <u>Cf.</u> <u>Duvall</u>, 9 Cal.4th at 475

19   (explaining that "[i]f no prima facie case is stated, the court will summarily deny the petition.  If,

20   however, the court finds the factual allegations, taken as true, establish a prima facie case for

21   relief, the court will issue an [order to show cause"); <u>See also</u> <u>Cannedy</u>, 2013 WL 452827 at *10-

22   11.  Therefore, the lack of any record excerpts attached to the final state court petition is not,

23   under <u>Richter</u>, presumed to be a basis for the petition's denial, and this court's review is not

24   limited to the exhibit-free pleading and brief that petitioner submitted to the California Supreme

25   Court.

26   ////

Instead, the court can presume that when the California Supreme Court adjudicated the merits of petitioner's claims, it had before it the entire record that accumulated through the end of petitioner's direct appeal, including the trial transcript.  Pinholster contains the basis for this presumption.  There, the parties agreed that when a California prisoner files a collateral challenge to his conviction or sentence in state court, the state-court record he presents on review includes the allegations set forth in the petition and "'any matter of record pertaining to the case.'" Pinholster, 131 S. Ct. at 1402 n.12 (quoting In re Hochenberg, 2 Cal.3d 870, 874 n.2, 87 Cal.Rptr. 681 (1970) (quoting Cal. Rule of Court 60), rejected on other grounds by In re Fields, 51 Cal.3d 1063, 1070 n.3, 275 Cal.Rptr. 384).  Furthermore, the Court observed,

> the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief."  It appears that the [California Supreme Court] generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also "review the record of the trial ... to assess the merits of the petitioner's claims[.]"

Id. (citations omitted).  The Ninth Circuit recently picked up on the same passage in Pinholster to emphasize that "[i]n evaluating Petitioner's claim, the state courts had to determine whether the allegations contained in the petition, viewed in the context of the trial record, established a prima facie case[.]" Cannedy, 2013 WL 452827 at *10 (citing Pinholster, 131 S. Ct. at 1402 n.12).

If Pinholster's definition of the contents of the California state-court record in a summary denial is broader than the California Supreme Court's requirement that a habeas petition come attached with "reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations," Duvall, 9 Cal. 4th at 474, that difference would not necessarily make Duval and Pinholster inconsistent.  Limiting federal habeas review to "the record that was before the state court," as Pinholster does, is not the same as limiting federal habeas review to the parts of the record that the state court actually considered.  Indeed, in light of California courts' common practice of issuing summary denials of

1   habeas petitions, it would be impossible to divine exactly which parts of the record compelled the

2   denial in a large number of habeas claims that come to California's federal courts.  However,

3   after <u>Richter</u> and <u>Pinholster</u>, it can be said in such cases that the absence of a procedural citation

4   in a summary denial means a denial based not just on the merits but on the entire underlying

5   state-court record – that is, at minimum, on the record and transcript generated at trial and in pre-

6   and post-trial proceedings.[8]  A federal court that proceeds on <u>Richter</u>'s presumption of an

7   adjudication on the merits therefore need not concern itself with the question of whether there

8   was some deficiency in the record excerpts that a petitioner submitted in state court and whether

9   its review is thus limited to that deficient record.  It may look, as this court does in this case, to

10  "any matter of record pertaining to the case."  <u>Pinholster</u>, 131 S. Ct. at 1402 n.12.

11       V.   <u>Petitioner's procedural competency claim</u>

12            "We begin with first principles.  The Constitution provides criminal defendants

13  with the right to be competent during trial."  <u>United States v. Duncan</u>, 643 F.3d 1242, 1248 (9th

14  Cir. 2011) (citations omitted).  The establishment of that right dates no later than 1960, when the

15  Supreme Court said that "the test [for competency] must be whether [the defendant] has

16  sufficient present ability to consult with his lawyer with a reasonable degree of rational

17  understanding – and whether he has a rational as well as factual understanding of the proceedings

18  against him."  <u>Dusky v. U.S.</u>, 362 U.S. 402 (1960) (per curiam) (internal quotation omitted).  The

19

---

20       [8] In <u>Pinholster</u>, the Court avoided the question of how to ascertain the appropriate scope
    of the state-court record for analysis under § 2254(d)(1) when "[t]he specific contents of the
21  state-court record depend on which of the two state habeas proceedings is at issue."  <u>Pinholster</u>,
    131 S. Ct. at 1402 n.12.  The Court noted it had "not previously ruled on how to proceed in these
22  circumstances, and we need not do so here[,]" because Pinholster's claims did not satisfy §
    2254(d)(1) even on the approach most favorable to him.  Those circumstances were somewhat
23  different than what happened in the state habeas process in this case: Pinholster petitioned the
    California Supreme Court twice, submitting "all of the evidence [he] ever submitted in state
24  habeas" the second time, while this petitioner submitted some evidence to the Court of Appeal
    and none to the California Supreme Court.  Still, this court need not answer the question either,
25  since the two claims at issue in this case depend on "any matter of record pertaining to the case"
    – i.e., the record that, according to <u>Pinholster</u>, every California court has before it when it
26  adjudicates a claim on the merits.

1  standard of competence to stand trial is the same as the standard of competence to plead guilty

2  and avoid trial.  See Godinez v. Moran, 509 U.S. 389, 399 (1993).

3           After Dusky, the due-process necessity of holding a hearing to determine

4  competency in cases where it is a genuine issue became clear in Pate v. Robinson, 383 U.S. 375

5  (1966), and Drope v. Missouri, 420 U.S. 162 (1975), both of which are discussed below.  By

6  1976, the Ninth Circuit, addressing a habeas petition challenging a state judgment of conviction,

7  would find that "[t]he petitioner's contention regarding the state trial court's failure to conduct a

8  hearing to determine his competency to stand trial rests upon [Pate] as applied in [Drope]" as

9  well as the circuit's own case law in Tillery v. Eyman, 492 F.2d 1056 (9th Cir. 1974), and Moore

10  v. United States, 464 F.2d 663 (9th Cir.1972).  de Kaplany v. Enomoto, 540 F.2d 975, 979 (9th

11  Cir.1976).  A habeas petitioner's allegation that he was denied a competency hearing has become

12  known as a "procedural incompetency claim" – a claim not to be confused with one of

13  "substantive incompetence," in which a petitioner avers he was in fact not competent to stand

14  trial.  See Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004).

15           In Moore, the Ninth Circuit summarized the due process requirements that

16  emerged after Pate:

17           Under the rule of Pate v. Robinson, a due process evidentiary
         hearing is constitutionally compelled at any time that there is
18       "substantial evidence" that the defendant may be mentally
         incompetent to stand trial.  "Substantial evidence" is a term of art.
19       "Evidence" encompasses all information properly before the court,
         whether it is in the form of testimony or exhibits formally admitted
20       or it is in the form of medical reports or other kinds of reports that
         have been filed with the court.  Evidence is "substantial" if it raises
21       a reasonable doubt about the defendant's competency to stand trial.
         Once there is such evidence from any source, there is a doubt that
22       cannot be dispelled by resort to conflicting evidence.  The function
         of the trial court in applying Pate's substantial evidence test is not
23       to determine the ultimate issue: Is the defendant competent to stand
         trial?  It[s] sole function is to decide whether there is any evidence
24       which, assuming its truth, raises a reasonable doubt about the
         defendant's competency.  At any time that such evidence appears,
25       the court sua sponte must order an evidentiary hearing on the
         competency issue.  It is only after the evidentiary hearing, applying
26       the usual rules appropriate to trial, that the court decides the issue

21

1    of competency of the defendant to stand trial.

2    Moore, 464 F.2d at 666.[9]  Nothing has altered the status of Pate and Drope as "clearly established

3    federal law" for purposes of AEDPA review in procedural competency cases, nor has Moore's

4    explication of Pate's meaning for trial courts – and for habeas review of trial courts' decisions –

5    changed in any appreciable way.  See, e.g., Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000)

6    (stating that the state court "correctly identified Pate as the controlling standard"); McMurtrey v.

7    Ryan, 539 F.3d 1112, 1125 (9th Cir. 2008) (relying on Moore to hold that "the evidence before

8    the state trial court regarding [the defendant's] behavior, medications, and memory problems was

9    sufficient to raise a reasonable doubt as to [his] ability to assist counsel").

10           In Drope, the Supreme Court explained Pate's application in determining whether

11   a competency hearing is necessary:

12           [E]vidence of a defendant's irrational behavior, his demeanor at
             trial, and any prior medical opinion on competence to stand trial
13           are all relevant in determining whether further inquiry is required,
             but ... even one of these factors standing alone may, in some
14           circumstances, be sufficient.  There are, of course, no fixed or
             immutable signs which invariably indicate the need for further
15           inquiry to determine fitness to proceed; the question is often a
             difficult one in which a wide range of manifestations and subtle
16           nuances are implicated.

17           . . .

18           Even when a defendant is competent at the commencement of
             his trial, a trial court must always be alert to circumstances
19           suggesting a change that would render the accused unable to meet
             the standards of competence to stand trial.
20

21   Drope, 420 U.S. at 180.  Even as it acknowledged that some evidence "standing alone may, in

22   some circumstances, be sufficient" to determine whether a substantial doubt of competence

23   exists, Drope cited favorably to the Ninth Circuit's observation in Moore that a psychiatric report

24   _____

25        [9] Moore reviewed a federal district court's denial of a motion for habeas relief under 28
     U.S.C. § 2255, the statute that governs challenges to convictions in federal courts.  de Kaplany
26   recited the principles detailed in Moore and applied them to a habeas challenge to a conviction in
     state court.  See de Kaplany, 540 F.2d at 980-81.

declaring the defendant competent "'did not stand alone'" as the only evidence the trial court should have considered.  Id. (quoting Moore, 464 F.2d at 666).  Reversing the petitioner's conviction, the Drope Court ruled that "in considering the indicia of petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia[.]"  Id. at 179-80 (emphasis added).  Indeed, since Drope, it has become well established that

> [e]ach particular bit of evidence is not to be viewed in isolation. One item of evidence, such as a psychiatric report, might be so probative of incompetence that its presence alone requires a hearing.  On the other hand, evidence of possible present incompetence, such as a history of psychiatric problems in the remote past, may be so overshadowed by other evidence of present competence that it does not demand further investigation at an evidentiary hearing. ... In determining whether or not there is a substantial doubt, the trial judge must evaluate all the evidence and evaluate the probative value of each piece of evidence in light of the others.

Chavez v. United States, 656 F.2d 512, 517-18 (9th Cir.1981).  The Chavez opinion noted that the terms "sufficient doubt," "good faith doubt," "genuine doubt," "reasonable doubt" and "substantial doubt" as to a defendant's competence to stand trial all "describe the same constitutional standard."  Id. at 516 n.1.  The Ninth Circuit has also used the phrase "bona fide doubt" in applying Pate and Drope.  See, e.g., U.S. v. White, 670 F.3d 1077, 1082 (9th Cir. 2012); Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010); Moran v. Godinez, 57 F.3d 690, 695 (9th Cir.1994).

There is some ambiguity as to which of § 2254(d)'s subsections provides the proper standard for analyzing petitioner's due process claim.  The Ninth Circuit has admitted this ambiguity, saying a state court's "decision that the evidence did not require a Pate hearing could be either 'an unreasonable application' of Pate (under the second clause of § 2254 (d)(1)) or 'an unreasonable determination of the facts in light of the evidence presented' in state court (under § 2254 (d)(2))."  Torres, 223 F.3d at 1107.  In Maxwell, cited supra, the Ninth Circuit relied on Torres for the proposition that "[a] state court's finding that the evidence before the trial court did not require a competency hearing under Pate is a finding of fact" but concluded that the state

1    court had been unreasonable under § 2254(d)(2) and (d)(1).  Maxwell, 606 F.3d at 567.

2             Petitioner argues that the state courts' failure to give him a competency hearing

3    was an unreasonable finding of fact under § 2254(d)(2).  See Pet. at 64.  For its part, respondent

4    ignores § 2254(d)(2) and argues exclusively under § 2254(d)(1), contending that the California

5    Court of Appeal reasonably applied United States Supreme Court precedent.  Indeed, respondent

6    does not cite, mention or discuss Pate or Drope a single time in its answer.  See Answer (Docket

7    No. 27), Table of Authorities, sans Pate and Drope.  Instead, respondent argues that petitioner

8    has no claim under Medina v. California, 505 U.S. 437 (1992), and Cooper v. Oklahoma, 517

9    U.S. 348 (1996).  Neither precedent applies here.  "The issue in Medina was who would bear the

10   burden of proof at a formal competency hearing – the defendant or the state.  In contrast, the

11   instant case involves the threshold question of whether such a hearing was required in the first

12   place."  Miles, 108 F.3d at 1113 n.3.  In Cooper, the Court considered "whether a State may

13   proceed with a criminal trial after the defendant has demonstrated that he is more likely than not

14   incompetent" – that is, what quantum of proof is permissible "'[o]nce a State provides a

15   defendant access to procedures for making a competency evaluation[.]'" Cooper, 517 U.S. at

16   355, 364 (quoting Medina, 505 U.S. at 449).  Medina and Cooper would be the "clearly

17   established Federal Law" controlling this case if petitioner had received a competency hearing

18   and were now challenging the burden or quantum of proof he was required to meet there.  But the

19   issue he actually raises, of whether the state courts were unreasonable in not ordering a hearing,

20   is an entirely separate, predicate point to the application of Medina and Cooper.

21             The Torres panel said it was "inclined to analyze the state court's decision ... as a

22   potentially unreasonable determination of the facts."  Torres, 223 F.3d at 1107.  This court is also

23   so inclined; therefore it will analyze the state court's decision under § 2254(d)(2).  See Davis v.

24   Woodford, 384 F.3d 628, 644 (9th Cir.2003) (stating it would defer to the state courts' decisions

25   not to order a competency hearing "unless they are 'unreasonable' within the meaning of 28

26   U.S.C. § 2254(d)(2)"); Waller v. Wofford, No. CV 12-4707-AJW, 2012 WL 5870762 at *3

1  (C.D.Cal. Nov. 19, 2012).  But see Gilbert v. Mullin, 302 F.3d 1166, 1179 (10th Cir. 2002)

2  (stating that "[t]he state court's ultimate determination that a competency hearing was

3  unnecessary is, however, a question of law to be reviewed pursuant to § 2254(d)(1)"); Wright v.

4  Sec'y for the Dep't of Corr., 278 F.3d 1245, 1256 (11th Cir. 2002).

5       A.   Analysis under § 2254(d)(2)

6            When a habeas petitioner alleges a state court made a unreasonable determination

7  of fact under § 2254(d)(2), the federal habeas court "must be particularly deferential to our state-

8  court colleagues" on their determinations of fact.  Taylor v. Maddox, 366 F.3d 992, 999-1000

9  (9th Cir. 2004).  This court "may not second-guess a state court's fact-finding process unless,

10  after review of the state-court record, it determines that the state court was not merely wrong, but

11  actually unreasonable."  Id. at 999.

12            "Challenges under § 2254(d)(2) fall into two main categories.  First, a petitioner

13  may challenge the substance of the state court's findings and attempt to show that those findings

14  were not supported by substantial evidence in the state court record.  Second, a petitioner may

15  challenge the fact-finding process itself on the ground that it was deficient in some material

16  way."  Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012) (relying on Taylor, 366 F.3d at

17  999-1001).[10]  The Hibbler panel discussed some of the permutations of the latter category, in

18  which "the fact-finding process itself was deficient in some material way."  The court said that

19            [i]n some limited circumstances, we have held that the state court's
            failure to hold an evidentiary hearing may render its fact-finding
20            process unreasonable under § 2254(d)(2).... A state court's decision
            not to hold an evidentiary hearing does not render its fact-finding
21            process unreasonable so long as the state court could have
            reasonably concluded that the evidence already adduced was
22            sufficient to resolve the factual question.

23  Id. at 1147 (citations omitted).

24  _____

25      [10] The Ninth Circuit has identified a third category, the rarest and "simplest[,] where the
    state court should have made a finding of fact but neglected to do so.  In that situation, the state-
26  court factual determination is perforce unreasonable and there is nothing to which the
    presumption of correctness can attach."  Taylor, 366 F.3d at 1000-01.

Both of Hibbler's iterations of an unreasonable determination of fact so squarely overlap the standards set by the Supreme Court in Pate, Drope and the many Ninth Circuit cases applying them that it is no reach to refer to a procedural competency claim in a habeas petition as a "Pate-Hibbler claim." First, Pate and Hibbler set an identical standard of "substantial evidence" for determining whether competence to stand trial is (or was) an issue before a state court. It is an objective factual inquiry that, if met, carries a mandate: "[o]nce there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. ... [T]he court sua sponte must order an evidentiary hearing on the competency issue." Moore, 464 F.2d at 666 (emphasis added). Second, the failure to hold any hearing when facts critical to due process are in dispute is an established basis for finding a state-court decision qualifies as an "unreasonable determination of fact." As the Ninth Circuit concluded in granting a different habeas claim, "if the state court had first conducted an evidentiary hearing and had then arrived at the same inferences and credibility determinations, we would not be second-guessing those procedures and results as objectively unreasonable." Nunes v. Mueller, 350 F.3d 1045, 1056 (9th Cir. 2003); see also Hurles v. Ryan, 650 F.3d1301, 1312 (9th Cir. 2011) (stating "[w]e have repeatedly held that where a state court makes factual findings without an evidentiary hearing or other opportunity for the [presentation of] evidence, 'the fact-finding process itself is deficient' and not entitled to deference"). Pate intersects with Hibbler's second category of challenges under § 2254(d)(2) here too: a state court's failure to hold a hearing constitutes an unreasonable determination of fact wherever Pate's "substantial evidence" element is met.

1. Evidence relevant to whether there was a substantial doubt about competency

"The question to be asked by the reviewing court is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." de Kaplany, 540 F.2d at 983. That inquiry requires looking at the evidence and information the trial court had before it. "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior

1   medical opinion on competence to stand trial are all relevant in determining whether" a

2   substantial doubt in competency existed." <u>Drope</u>, 420 U.S. at 180.  A trial court must also take

3   into account a defendant's history of mental illness and the effect of anti-psychotic or other

4   psychotropic medications throughout the proceedings.  See <u>McMurtrey v. Ryan</u>, 539 F.3d 1112,

5   1125-26 (9th Cir. 2008).  Indeed, a finding of competence at the beginning of trial is not final.

6   "Even when a defendant is competent at the commencement of his trial, a trial court must always

7   be alert to circumstances suggesting a change that would render the accused unable to meet the

8   standards of competence to stand trial." <u>Drope</u>, 420 U.S. at 181.

9            By the time petitioner informed the trial court that he would plead guilty to the

10  acts charged in the information, there was a large body of evidence relevant to his competence to

11  plead guilty to and stand trial for the killing of Mark Gerald Levitoff.  That evidence consisted

12  of:

13            (1) petitioner's extensive history of severe mental illness;

14            (2) his involuntary commitment by the trial court to Atascadero
              Mental Hospital in January 2002;
15
              (3) the eight-page evaluation from Dr. Beth A. Lawhead at
16            Atascadero, a report "designed to provide data about [petitioner's]
              competence," that described petitioner as having "quite a
17            complicated and prominent delusional system with paranoid,
              grandiose, and bizarre delusions," and recommended that "[h]e
18            should remain under the care of a psychiatrist" and "[r]eturn to
              court... on psychotropic medications and [would be] in need of
19            alternate mental health placement while awaiting trial;"

20            (4) the trial court's decision to place petitioner in the Plumas
              County jail while he awaited trial, in contradiction of one of Dr.
21            Lawhead's recommendations;

22            (5) Dr. Albert Globus' written statement of "alarm[] due to the
              seriousness of [petitioner's] psychiatric condition and the nature of
23            the psychiatric care he is receiving" in a letter that the court
              addressed on August 1, 2003, and placed under seal;
24
              (6) petitioner's colloquy with the court at his change-of-plea
25            hearing, including his responses about the effect of the medication
              he was taking at the time.

26  /////

Petitioner argues that two more facts that arose during trial should have alerted the trial court to his possible incompetence:

> (7) a reference by the trial judge to a conversation with John Sebold regarding petitioner's "difficulties" and "concerns last week about Mr. O'Brien;"

> (8) the prosecutor's description of petitioner's demeanor in the courtroom as "nearly motionless and mute."

"In determining whether or not there is a substantial doubt, the trial judge must evaluate all the evidence and evaluate the probative value of each piece of evidence in light of the others." Chavez, 656 F.2d at 518 (emphasis added). In a case like this one, where

> there is no dispute as to the evidence possibly relevant to petitioner's mental condition that was before the trial court prior to trial ... the dispute concerns the inferences that were to be drawn from the undisputed evidence and whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial denied him a fair trial.

Drope, 420 U.S. at 174-75. Keeping with Drope, this court will identify the inferences the state courts were bound by federal law to address and ask whether "the failure to make further inquiry into petitioner's competence to stand trial denied him a fair trial."

> a. Factors 1 and 2: Inferences from petitioner's history of mental illness and his commitment to Atascadero

The Plumas County Superior Court was well aware that petitioner had a long history of mental illness. When the court found him incompetent and committed him to the Atascadero State Hospital in January 2002, it did so after three psychiatric experts unanimously concluded that petitioner was too unstable to stand trial at that time. All three experts included petitioner's psychological history as a basis of their opinions, with one summarizing that "[petitioner] has a well documented history of mental illness since he was a young child. His tragic clash with his victim has, unfortunately, been in the making for more than twenty years." First Am. Pet. at 161 (Report of Dr. Bruce W. Ebert). The trial court expressly relied on these

1  reports in deciding to declare petitioner incompetent and commit him to Atascadero.  See CT

2  2:302-04 (accepting all three expert reports into evidence and finding, after having "considered

3  the evidence and based on the report[s,] [that] ... the defendant is incompetent to go to trial").

4        Petitioner's restoration to competency did not delete the relevance of his history of

5  mental illness, see Miles v. Stainer, 108 F.3d 1109, 1111-13 (9th Cir.1997) (finding reasonable

6  doubt in a defendant's competence existed less than one month after he was found competent),

7  nor is there any suggestion in the record that the trial court ever ignored it.  Even at sentencing,

8  the trial judge mentioned it, reflecting from the bench that petitioner "at the age of ten and a half,

9  was already, quite honestly, beyond – probably beyond help. ... This was an accident waiting for

10  a place to happen.  He was not given – there were problems.  Let's just leave it at that."  RT

11  5:1434.  The trial court thus acknowledged the gravity of petitioner's history of mental illness at

12  the beginning of the proceedings and at the very end, and its colloquy at the change-of-plea

13  hearing evince an acute awareness that petitioner's psychological history remained centrally

14  relevant.

15        b.  Factors 3, 4 and 5: Inferences from the adequacy of petitioner's housing,

16           from his professional psychological supervision and from Dr. Globus' letter

17        When petitioner returned to court on May 14, 2002, after his restoration of

18  competency, the court reviewed Atascadero's evaluation of petitioner's mental status.  See ART

19  1:30-36.  The author of the evaluation, Dr. Beth Lawhead, made three recommendations for

20  maintaining petitioner's competence: (1) "[h]e should remain under the care of a psychiatrist,"

21  (2) he "appears to be in need of alternate mental health placement while awaiting trial," and (3)

22  he should "[r]eturn to court... on psychotropic medications and [receive] alternate mental health

23  placement while awaiting trial."  SCT 39-40.  The cover letter and formal certification of

24  competence from Atascadero's medical director repeated these recommendations.  See CT

25  2:320-21.

26  /////

1    Atascadero's recommendations did not have the force of law, nor did any tenet of

2  federal due process require the Superior Court to follow any of them.  Moreover, the trial court

3  had the discretion under California law to house petitioner in any "appropriate secure facility

4  approved by the ... county mental health director[.]" Cal. Penal Code § 1372(e).  Every indication

5  is that the Superior Court acted within that discretion when it ordered petitioner be housed in the

6  county jail and not at a mental health facility as recommended.  The trial court consulted with

7  "our mental health director," who was of the opinion that petitioner "could be housed at the

8  county jail, that he would make sure that he was seen by the mental health department and also

9  seen by a psychiatrist, and that he would assist in making sure that [petitioner] took the

10  appropriate medication."  ART 1:34.  "[W]hat I'm concerned about," concluded the judge, "is

11  while he's in our county jail, he maintain his competency, so we can proceed to trial and have

12  whatever is going to happen is going to happen."  Id. at 35-36.  It is clear from the record that the

13  trial court was mindful of the provisions it would have to make to maintain petitioner's

14  competence.

15    On July 25, 2002, Dr. Globus wrote a letter to Janet Hilde, petitioner's trial

16  counsel.  First Am. Pet. at 147.  Dr. Globus expressed his "alarm due to the seriousness of

17  [petitioner's] psychiatric condition and the nature of the psychiatric care he is receiving."  Id.  Dr.

18  Globus described petitioner's illness and his concerns in detail:

19          Mr. Dickey-O'Brien has a serious mental illness which is of
            psychotic proportions.  It is currently ameliorated by his
20          medications.  However, his illness is manifested by a distorted
            view of reality, not shared by either the consensus of the general
21          nor of the prison population.  Because he sincerely believes his
            own psychopathological perceptions, he may act on them out of
22          fear, anxiety, or anger.  He probably possesses the usual concepts
            that prisoners have including a desire to be free of incarceration
23          and potential anger at supposed mistreatment.  Because of his
            illness, he may have still other more irrational beliefs and feelings.
24          ... In short, when his illness is most active, his view of the world is
            largely idiosyncratic and not based on a consensual view of reality.
25          He might act on these bizarre thoughts and feelings sincerely
            believing that they are true though they may be unknown or seem
26          irrational, even idiotic, or dangerous to others.  In short, he could

do something entirely unpredictable and unanticipated. This probability seems somewhat remote now that he is medicated, but could occur again either if he failed to take his medicine or the dose should be insufficient to control his signs and symptoms. This potential is the source of my alarm.

Another aspect of his situation alarms me. He takes powerful antipsychotic, antiseizure, antidepressant medications which have a host of side effects and whose dosage must be adjusted according to his mental state and their side effects. If I am not mistaken, he does not have frequent contact with a psychiatrist, who would be able to recognize side effects. Further a psychiatrist could recognize early changes if the dosage is too low and act quickly and accurately to adjust his medication, thereby avoiding an acute psychotic break leading to another hospitalization at Atascadero or much worse.

The best medical solution to both these problems would be to have a licensed psychiatrist see him on a regular basis. ... If direct psychiatric treatment were not possible, a licensed Ph.D. level psychologist should see him on the same regimen and consult with a psychiatrist, who, in turn, could then adjust his medication.

In this case a major tragedy has already occurred most likely due to [petitioner] being off his medication. Proper treatment as described above would reduce the likelihood of another tragedy to essentially that which occurs in the normal population.

Id. at 147-48.

The trial court did not dismiss Dr. Globus' opinions when counsel brought the letter to its attention one week later in an ex parte closed session. The court responded first by contacting John Sebold, the county mental health director. According to the court,

. . . Mr. Sebold is monitoring Mr. O'Brien's medications. Although he is not a psychiatrist or a psychologist, he has a master's degree I believe. However, he indicated to me that he is making arrangements for Mr. O'Brien to see a psychiatrist, but I don't know what date that's – when that is, and I believe a copy of that letter will be given to the psychiatrist. I encourage counsel to talk to Mr. Sebold. If at such time there are any issues or any problems that need to be dealt with, they should be brought back before the Court. I will make the appropriate orders, including having Mr. O'Brien seen by appropriate medical personnel if in fact he is not being given the appropriate medical treatment or services, but at this point I have not seen anything that indicates otherwise, okay? But I'm also open to you telling me otherwise and also, if there are problems in jail, then we need to deal with those issues, okay?

31

1      MS. HILDE:  Thank you, your Honor.  I think he does need
to see a psychiatrist so I'll follow up on that.

2

3      THE COURT: Would you follow up on that?  If you're not
satisfied with the services that are being rendered, come to court
and we can do an ex parte if necessary and we can get John [sic]

4      Sebold here to deal with it or whatever and if, again, he's not given
the appropriate services, we'll deal with that.

5

6   SRT 2:338-39.

7           Dr. Globus' letter does not say that petitioner was in danger of losing his

8   competency to stand trial.  Rather, Dr. Globus' overall concern was that petitioner could, if not

9   treated and monitored properly, relapse, a development that by definition would have cast grave

10  doubt on his competence.  But when Dr. Globus wrote his letter that had not happened, nor did

11  he say he expected it to happen.  He said that when he saw petitioner, the psychosis was

12  "currently ameliorated by his medications."  First Am.Pet. at 147.

13          For purposes of this court's Pate-Hibbler inquiry into the existence of substantial

14  doubt, there is nothing in the record to suggest that Ms. Hilde did not do as she promised (i.e.

15  follow up with a psychiatrist).  Indeed, the record is clear that Dr. Thompson evaluated petitioner

16  in September 2002, and Ms. Hilde represented to the court at the change-of-plea hearing that

17  petitioner had just seen a psychological professional.  As discussed below, that assurance is key

18  in assessing whether there was bona fide doubt of competency in this case.

19              c.  Factor 6: Inferences from the change-of-plea colloquy

20          At the change-of-plea hearing, the court confirmed with petitioner's counsel that

21  petitioner had seen a psychiatrist or psychologist only four days earlier.  Although no

22  documentation of that evaluation appears in the record, petitioner has never contested his

23  counsel's assurance to the court that the examining doctor did not "indicate any doubt ...

24  whatsoever regarding [petitioner's] competency."  SRT 2:451-52.

25          During the plea colloquy, the trial court questioned petitioner about his

26  medications and whether he had been taking them:

1   THE COURT:   Mr. O'Brien, let me talk to you now.

2   . . .

3   Could you tell me what medications you're currently taking today?

4   THE DEFENDANT:   Zyprexa, Trileptal, and Wellbutrin.

5   THE COURT:   Now, have you taken those medications today?

6   THE DEFENDANT:   Yes.

7   . . .

8   THE COURT:   Do you know what your dosage is –

9   THE DEFENDANT:   No, I don't.

10   THE COURT:   – on those medications?

11   THE DEFENDANT:   No.

12   THE COURT:   Has your dosage changed since you've been
brought back from the state hospital?

13

14   THE DEFENDANT:   No, your Honor.

   THE COURT:   So you're taking the same dose of the same
15   medication.

16   THE DEFENDANT:   Yes.

17   Petitioner's response to the last question was inaccurate.  On May 1, 2002, when petitioner was

18   certified to leave Atascadero State Hospital and to stand trial, the psychotropic drugs he was

19   taking were Olanzapine, Wellbutrin and Depakote.  See SCT 40.  The medical director at

20   Atascadero wrote in its cover letter to the certification that "[i]t is important that the patient

21   remain on this medication... to enable him to be certified under Section 1372 of the [California]

22   Penal Code." CT 2:320.  And indeed, on May 14, 2002, the court ordered that he continue taking

23   those drugs at the same dosage.  Id. at 2:323.  But at the hearing of November 19, 2002, the

24   petitioner informed the trial court that he was taking Zyprexa, Trileptal, and Wellbutrin – in other

25   /////

26   /////

33

words, that the names of two of the three psychotropic medications were different[11] – and that he did not know what dosages he was taking.  Nonetheless, when the court asked whether he was "taking the same dose of the same medication," petitioner responded "Yes."

Standing alone, the inconsistencies in petitioner's statements about his medication might have created the "experience" of doubt to trigger a competency hearing.[12]  However, the totality of the evidence before the court that day does not support that finding.  Petitioner's testimony at the change-of-plea hearing was notable for the control and presence he displayed. The court had just heard petitioner's counsel say neither she nor the last doctor who examined petitioner had any doubt that he was competent.  Petitioner confirmed that he had taken his medication that morning, and clearly expressed his understanding of the proceedings. The salient point, in other words, was not so much what medication he was taking, but that he was effectively medicated to make a competent change of plea and stand trial on the question of his sanity at the time of the killing.

/////

/////

---

[11] A "google" search reveals, however, that Zyprexa is a trade name for Olanzapine. http://www.news-medical.net.

[12] For example, in McGregor v. Gibson, 248 F.3d 946, 956 (10th Cir. 2001), the Tenth Circuit vacated a state prisoner's conviction and death sentence in part because three experts had admonished the court that "[petitioner] was legally competent so long as he remained properly medicated," yet his "continued proper medication was called into doubt multiple times at trial." On one of those occasions, petitioner had refused to take Thorazine, one of the drugs prescribed to maintain his competence.  On another occasion, the court was informed that the jail keeping petitioner had temporarily run out of Thorazine, which the petitioner was supposed to take to maintain competency.  Although the state argued there had never been any material change in the dosage, the Tenth Circuit, applying the "bona fide doubt" test, found that "the explanation for the 'changed dosage' does not waylay concerns that should have arisen when the court was informed defendant refused to take his Thorazine and, more importantly, was informed that the jail had insufficient supplies of Thorazine."  Id. at 957-58.  The federal appellate court noted that "[t]he state's inconsistent assertions as to the dosage of Thorazine petitioner was supposed to receive added to the confusion concerning whether petitioner was properly medicated and would have given a reasonable judge even more cause to doubt petitioner's competency to stand trial."  Id. at 958 n.8.

1        d.   Factors 7 and 8: Inferences from petitioner's demeanor and mid-trial

2             "difficulties"

3        Petitioner asserts that the vague reference to his "difficulties" in early January

4   2003 during trial and his "motionless and mute" demeanor in the courtroom should have given

5   the trial judge or the Court of Appeal a significant doubt about his competence.  As to the latter

6   suggestion, the prosecutor made his comment about petitioner's demeanor in advocating his

7   theory that petitioner was malingering or "manufacturing a defense."  RT 4:999.  The prosecutor

8   argued to the trial judge that petitioner "has basically sat nearly motionless and mute, which to

9   some people might suggest either ... impairment or massive effect from psychiatric medications,

10  so the question would be whether it's permissible for me to bring in evidence of a more voluble

11  character during the time of trial."  Id.  The trial judge responded that while the jury would

12  inevitably observe the petitioner when he was in the courtroom, as an evidentiary matter his

13  behavior in front of them was irrelevant.  Id. at 1002-04.  That was the gravamen of the

14  discussion about petitioner's demeanor: the trial judge was naturally aware of the petitioner's

15  passive presence in the courtroom,[13] but nobody argued it as a sign of possible incompetence.

16        The Ninth Circuit has cautioned that calm behavior does not necessarily mean a

17  defendant is competent.  "After all, competence to stand trial does not consist merely of passively

18  observing the proceedings. ... The judge may be lulled into believing that petitioner is competent

19  by the fact that he does not disrupt the proceedings, yet this passivity itself may mask an

20  incompetence to meaningfully participate in the process."  Odle v. Woodford, 238 F.3d 1084

21  1089 (9th Cir.2001).  This is in a sense a negative admonition: a defendant's calm behavior is not

22  proof of competence per se, but neither is it a glaring signal creating significant doubt about a

23  defendant's competence.  The reasonable inferences available from a defendant's calm behavior

24  are necessarily dependent on other factors, and it was not unreasonable in this case for the trial

25  ───────────────

26      [13] In fact, the trial judge relied in part on his observations and interaction with petitioner
     in finding him competent to plead guilty at the change-of-plea hearing.  See SRT 2:474.

judge to have relied in part on his observations of the petitioner, particularly in light of other

information, such as petitioner's own assurances at the change-of-plea hearing, that the judge had

collected through his own experience with petitioner and his counsel.

As for the petitioner's "difficulties" during the trial, he has not provided enough

specificity for this court to say what the trial court meant in that regard, much less what was

reasonable for it to infer.  Presumably petitioner would know what the court was talking about;

he was present when the court made reference to it, but he offers no clarification now.  The

record and the argument to this court is therefore inconclusive on this point.

2.   Whether it was unreasonable not to call a competency hearing

In Odle, the trial court had "a comprehensive record" of the petitioner's history of

mental instability before it and had "heard the testimony of experts who described the extensive

damage to Odle's brain."  Odle, 238 F.3d at 1088.  The Odle court rejected an argument asserted

by the respondent in this case and relied upon by the Court of Appeal in its denial,[14] that

petitioner's counsel thought he was competent to plead guilty and proceed to trial on his insanity

defense.  The Ninth Circuit ruled that "counsel is not a trained mental health professional, and his

failure to raise petitioner's competence does not establish that petitioner was competent.  Nor, of

course, does it mean that petitioner waived his right to a competency hearing."  Id. at 1088-89.

The court continued:

> We do not dismiss lightly the fact that no one questioned Odle's
> competence over the course of two years of pre-trial proceedings
> and twenty-eight days of trial.  The observations of those
> interacting with petitioner surely are entitled to substantial weight.
> But personal observations cannot overcome the significant doubt
> raised by the clinical evidence.  The record revealed an extensive
> history of mental impairment, and expert testimony and jail records
> suggested that Odle's mental problems lay not just in the past, but
> continued until the time of trial.

Id. at 1089 (citations omitted).  The respondent in Odle also argued that the evidence of the

---

[14] See Court of Appeal's opinion, Lodged Doc. 4 at 15, supra.

1   petitioner's mental impairment past and present was irrelevant because he had appeared calm in

2   the courtroom.  "But," the Ninth Circuit said, "calm behavior in the courtroom is not necessarily

3   inconsistent with mental incompetence. ... Odle's behavior in the courtroom does not refute the

4   large body of clinical evidence which tended to cast doubt on his competence." Id. at 1088.

5          Here, petitioner argues that if the claim in Odle succeeded, his must too: quoting

6   Odle, he says his "extensive history of mental impairment" contains "at least double Odle's

7   number of hospitalizations, and [petitioner's] history of psychosis was over three times as long.

8   Furthermore, Petitioner had been found incompetent by three different doctors and the trial court;

9   Odle had never been found incompetent." Petitioner's Brief at 70 (Docket No. 25).

10          This case is distinguishable from Odle in a couple of respects.  First, although two

11   psychological experts who had evaluated petitioner (Drs. Lawhead and Globus) warned about the

12   possibility of relapse, there was never any indication from anybody that his mental illness had

13   actually re-manifested before, during or after trial.[15]  The loudest "alarm," the letter from Dr.

14   Globus, clearly stated that as of the date of that evaluation, petitioner's psychosis had been

15   ameliorated by medication.  It is significant that the Globus letter does not use the word

16   "incompetent" or directly address whether he was at risk of becoming unable to assist in his

17   defense and understand the proceedings against him. See Moreno v. Yates, No. CV 08-3255-

18   AHM (RNB), 2009 WL 1530668 at *10 (C.D.Cal. May 29, 2009) .  Dr. Globus' primary concern

19   in his letter was for the safety of the petitioner and other inmates and staff at the county jail.

20   Clearly, a relapse would cast doubt over petitioner's competence, and indeed that appears to have

21   been the court's implicit concern in the closed session with Ms. Hilde at which they discussed

22   Dr. Globus' letter.  The exact timing of a professional "follow-up" with petitioner after the

23   closed session is not clear in the record, but the only court action under scrutiny here is its

24

25          [15] That this petitioner's physiological condition was treatable and remediable also
      distinguishes it from Odle, where, "as the trial judge was aware, [petitioner] was missing a piece
26   of his brain the size of a grapefruit." Odle, 238 F.3d at 1089.

proceeding without a competency hearing in light of the evidence of competence or

incompetence that came to its attention after petitioner's restoration to sanity in May 2002.

Given what the Globus letter did - and more importantly did not - say, it was not unreasonable

that the trial court did not, after reading the letter, have the constitutionally salient experience of

"significant doubt raised by the clinical evidence." Odle, 238 F.3d at 1089.

Second, it is still the case that "[t]rial counsel's assurances to the court are

relevant because 'defendant's counsel is in the best position to evaluate a client's comprehension

of the proceedings.'" Stanley v. Cullen, 633 F.3d 852, 861 (9th Cir.2011) (quoting Hernandez v.

Ylst, 930 F.2d 714, 718 (9th Cir. 1990)).  Likewise, "defense counsel will often have the best-

informed view of the defendant's ability to participate in his defense." Medina, 505 U.S. at 450

Here, Ms. Hilde gave more than her lay assurance that her client comprehended the proceedings

of the change-of-plea hearing and could assist in his own defense: she reported that four days

prior, a psychological expert[16] had come to same conclusion.  That assurance was of a piece with

the trial court's observance of most (though not all) of Dr. Lawhead's recommendations and its

response to Dr. Globus' letter.  The Globus letter did inform the trial court that it had made a

risky compromise by placing petitioner in the Plumas County jail and not a mental health facility,

as Dr. Lawhead recommended, but

> [t]here was also evidence before the trial court of [petitioner's] competency that could have shaped the trial judge's "total experience and his evaluation of the testimony and events of the trial." [Petitioner] participated in the necessary colloquies with the court... [and] testified coherently.... That a defendant is "alert, unafraid to address the court, and able to use somewhat technical legal terms appropriately" is a factor suggesting that a competency hearing is not required.

Stanley, 633 F.3d at 861 (internal citations omitted).  But cf. Pate, 383 U.S. at 385-86 (making

clear that a defendant's performance in a colloquy is not by itself a constitutional "justification

---

[16] When asked by the court if petitioner had seen "a psychologist or psychiatrist," Ms. Hilde answered "yes" without specifying which. SRT 2:452.

1  for ignoring the uncontradicted testimony of [petitioner's] history of pronounced irrational

2  behavior").

3           When a court has before it a multitude of factors relevant to the question of

4  competence, "even one ... standing alone may, in some circumstances, be sufficient" to create the

5  substantial doubt that ends further inquiry and necessitates a full hearing on a defendant's

6  competence to stand trial.  Drope, 420 U.S. at 180.  At the same time, "in considering the indicia

7  of petitioner's incompetence separately, the state courts [must not give] insufficient attention to

8  the aggregate of those indicia[.]"  Id. at 179-80.  The "substantial doubt" standard

9           do[es] not mean that doubt necessarily exists, and thus a hearing is
           required, because certain evidence exists which would create doubt
10          were it not for other evidence that precludes doubt.  Genuine
           doubt, not a synthetic or constructive doubt, is the measuring rod.
11          The emergence of genuine doubt in the mind of the trial judge
           necessarily is the consequence of his total experience and his
12          evaluation of the testimony and events of the trial.

13  de Kaplany, 540 F.2d at 983.  See also Chavez, supra (stating that "in determining whether or not

14  there is a substantial doubt, the trial judge must evaluate all the evidence and evaluate the

15  probative value of each piece of evidence in light of the others").

16          Nothing persuades this court that the trial judge did not consider the aggregate of

17  the many factors before him in failing to call a competency hearing before he accepted

18  petitioner's change of plea or at any other time through sentencing.  The court finds that although

19  there were relevant signals of concern about petitioner's condition – his history of severe mental

20  illness, the letter of "alarm" from Dr. Globus, and confusion about the particulars of petitioner's

21  medicinal regimen – those factors individually or together can only be said to comprise a

22  "synthetic doubt" of the kind disavowed in de Kaplany.  In light of all the circumstances and

23  factors known to him, it was not unreasonable for the trial judge not to experience a genuine

24  doubt in petitioner's competence.  Insofar as the Court of Appeals had a record of the same

25  factors before it, that court did not make an unreasonable determination fact necessary for relief

26  under § 2254(d)(2).

3.   Whether it was unreasonable not to order an evidentiary hearing on state

habeas review

Petitioner asserted a substantive competence claim to the state habeas courts – that

is, he claimed he was actually incompetent when he pled guilty and presumably throughout his

trial.  See First Am. Pet. at 63 (alleging "the state habeas court unreasonably rejected Petitioner's

claim of actual incompetence").  However, he does not make a full-throated argument to this

court that he was actually incompetent at the change-of-plea hearing.  Instead he argues under §

2254(d)(2) that the state habeas courts made unreasonable determinations of fact in failing to

hold an evidentiary hearing or allow discovery "when presented with evidence that Petitioner was

unable to assist in his defense because of paranoid delusions and excessive somnolence."  Id. at

71; see Hibbler, supra.

"A state court's decision not to hold an evidentiary hearing does not render its

fact-finding process unreasonable so long as the state court could have reasonably concluded that

the evidence already adduced was sufficient to resolve the factual question."  Hibbler,  693 F.3d

at 1147.  Indeed,

> the state courts are not required to address every jot and tittle of
> proof suggested to them, nor need they "make detailed findings
> addressing all the evidence before [them]."  To fatally undermine
> the state fact-finding process, and render the resulting finding
> unreasonable, the overlooked or ignored evidence must be highly
> probative and central to petitioner's claim.  In other words, the
> evidence in question must be sufficient to support petitioner's
> claim when considered in the context of the full record bearing on
> the issue presented in the habeas petition.

Taylor, 366 F.3d at 1001.  During the state habeas process, petitioner submitted a sworn

declaration dated June 2, 2007, in which he claims that even at the time he was restored to

competency at Atascadero, and then through trial and sentencing, "I did indeed continue to have

a prominent delusional system" that involved all sorts of paranoid hallucinations.  First Am.Pet at

150, ¶ 16.  He says he discussed his delusional beliefs with Ms. Hilde "[o]n several occasions

prior to trial and after being returned from Atascadero State Hospital" and that "[a]t the time of

1  my guilty plea, I was still under the delusional belief system ... and in fear for my life."  Id. at

2  151, ¶¶ 28, 30.[17]

3         It was not an unreasonable determination of fact for the state habeas courts to

4  decline calling a hearing on petitioner's claim that he was actually incompetent.  If true, his

5  sworn statement that he was still having bizarre hallucinations and fears would mean that three

6  psychological experts completely missed pronounced re-manifestations of his mental illness and

7  that petitioner did not tell them about his ongoing delusions.[18]  The same would be true of the

8  doctor who evaluated him four days before the change-of-plea hearing.  His claim that he told his

9  lawyer about his delusions would mean that his attorney lied to the court when she said she had

10  "no doubt" and was "certain" of his competence.[19]  SRT 2:451-52.  It would also mean that

11  petitioner lied at the plea colloquy during which the trial judge focused intently on petitioner's

12  present mental state and on the effects of his medications that day.  Petitioner gave clear

13  responses, including statements that his medications "make me better" and "[t]here are a few side

14  ─────────────────

15  [17] Insofar as petitioner introduced his affidavit during the state habeas process and not to any court on direct review, this is the only assertion of unreasonableness under § 2254(d)(2) that

16  does not require this court to look through to the Court of Appeal's decision on direct appeal. Instead the court addresses the California Supreme Court's implicit refusal to hold an evidentiary

17  hearing when it denied petitioner's state habeas challenge without comment.  However, as far as this court can tell from the record, petitioner attached his affidavit only to the petition he filed

18  with Court of Appeal and not to his petition with the California Supreme Court.  See Lodged Docs. 9 and 11.  Still, this court can proceed on the U.S. Supreme Court's presumption that the

19  California Supreme Court had the affidavit before it, along with the rest of the state court record, when it denied his petition without an evidentiary hearing.  See Pinholster, supra (finding the

20  California Supreme Court was able to consider "any matter of record pertaining to the case" on state habeas review).

21  [18] Dr. Howle, for example, testified that when he evaluated petitioner on May 22, 2002, when petitioner claims he was still having hallucinations, petitioner was "no longer psychotic...

22  [T]here was no evidence of paranoia, no delusions[.] ... [His] severe mental illness had been adequately and appropriately treated with medication[.]" RT 2:447.

23

24  [19] In his memorandum of authorities to this court, petitioner claims that had the state habeas courts called an evidentiary hearing, Ms. Hilde "would have testified, consistent with

25  Petitioner's account, that her meetings with Petitioner were of no value, and that Petitioner repeatedly discussed various delusional beliefs he had, as detailed in his declaration."  First

26  Am.Pet. at 72.  There is no evidence to support petitioner's assertions, and such assertions are entirely contradicted by Ms. Hilde's representations to the trial court.

41

effects but nothing that would interfere with my ability to comprehend these proceedings." Id. at 454-55. He described the side effects: he reported dry mouth, drowsiness and a "spacey-headed feeling," but he reported no hallucinations Id. at 456. He also said he understood the consequences of changing his plea. Id.

The transcript and the record suggest that petitioner was forthright with the court about what his condition was that day and that his post-trial, sworn declaration that he continued to have paranoid delusions while on his medication could be reasonably construed as lacking credibility. This court makes no finding regarding its credibility; AEDPA restricts the court simply to a decision as to the reasonableness of the last state court decision to deny an evidentiary hearing "in the context of the full record bearing on the issue presented in the habeas petition." Taylor, 366 F.3d at 1001. The state habeas courts had plenty of evidence contradicting petitioner's self-serving assertions that he was still experiencing paranoid hallucinations between his restoration to sanity and his sentencing. The context of the full record made it reasonable to decide the "substantial doubt" question without an evidentiary hearing or allowing further discovery. Therefore this version of his claim under § 2254(d)(2) lacks merit.

VI. Petitioner's claim that the jury instruction on insanity was unconstitutional

Petitioner claims the state courts unreasonably applied Supreme Court authority when they held that the trial court's jury instruction on insanity, taken directly from the pattern instruction written as CALJIC 4.00 at the time, did not violate his right to a fair trial. The trial court adopted the wording of the instruction verbatim from California Penal Code § 25(b). The instruction stated:

> A person is legally insane when, by reason of mental disease or defect, he was incapable of either:
>
> (1a)   Knowing the nature and quality of his act; or
>
> (1b)   Understanding the nature and quality of his act; or
>
> (2)    Distinguishing right from wrong at the time of the commission of the crime.

1  RT 5:1304.  Petitioner's counsel used the instruction as a visual aide when she questioned the

2  psychological experts who testified at the sanity trial.  See RT 2:438, 447-48.  The first expert

3  she asked to refer to it, Dr. Jerry Howle, testified "[t]hat is not the M'Naghten test as it was

4  established by Queen Victoria in England when Don M'Naghten was tried, but it's close."  RT

5  2:439.  Petitioner now argues that it was not close enough.

6           The flaw in the instruction, according to petitioner, is in Section (2).  It directs the

7  jury's attention to petitioner's ability to distinguish right from wrong "at the time of the

8  commission of the crime."  That definition deviates from the classic M'Naghten standard for

9  determining legal insanity – specifically, from M'Naghten's second prong (known as the "moral

10  incapacity" component[20]), which requires a finding of insanity if "a mental disease or defect

11  leaves a defendant unable to understand that his action is wrong."  Clark v. Arizona, 548 U.S.

12  735, 747 (2006) (emphasis added).  Petitioner further explains how the instruction and § 25(b)

13  are different:

14           Significantly, under M'Naghten, a person is insane even if
          he fully understands the difference between right and wrong at the
15          time of his charged act, as long as, due to mental disease or defect,
          he believed that his charged act was not wrong.

16
          Conversely, under the trial court's CALJIC 4.00
17          instruction, this same man would be found sane, regardless of
          whether he believed his acts were morally and legally right due to
18          mental disease or defect.

19          CALJIC 4.00 and § 25(b) are completely unconcerned with
          whether the accused believed his acts were wrong or right, as long
20          as he had a "general" understanding of right vs. wrong.  But
          M'Naghten, however, is only concerned with whether the accused
21          knew his acts were wrong.

22  Petitioner's Brief at 49-50.  "The difference," says petitioner, "could not be starker."  Id. at 50.

23  /////

24

25       [20] The first prong of M'Naghten, which CALJIC 4.00 splits into parts (1a) and (1b),  is
    known as the "cognitive capacity" component.  Section 25(b) repeats those parts from
26  M'Naghten verbatim, and petitioner brings no challenge to them here.

                                       43

1        Even accepting, for the sake of argument, that the contrast is so stark, the question

2   under AEDPA is whether in this case the difference was the premise of an unreasonable

3   application of clearly established federal law.  "[N]ot every ambiguity, inconsistency, or

4   deficiency in a jury instruction rises to the level of a due process violation.  The question is

5   'whether the ailing instruction ... so infected the entire trial that the resulting conviction violates

6   due process.'"  Middleton v. McNeil, 541 U.S. 433, 437 (2004) (quoting Estelle v. McGuire, 502

7   U.S. 62, 72 (1991)).  The Supreme Court has "defined the category of infractions that violate

8   'fundamental fairness' very narrowly.  Beyond the specific guarantees enumerated in the Bill of

9   Rights, the Due Process Clause has limited operation."  Estelle, 502 U.S. at 73 (internal

10  quotations and citations omitted).  "[A] single instruction to a jury may not be judged in artificial

11  isolation, but must be viewed in the context of the overall charge."  Boyde v. California, 494 U.S.

12  370, 378 (1990) (internal quotations and citations omitted).  If a jury instruction is ambiguous, it

13  is unconstitutional only if there is "a reasonable likelihood that the jury has applied the

14  challenged instruction in a way that prevents the consideration of constitutionally relevant

15  evidence."  Id. at 380; see also Estelle, 502 U.S. at 73 n.4.

16       There is nothing sacrosanct about M'Naghten in American law.  In Clark v.

17  Arizona, cited above, the U.S. Supreme Court addressed the Arizona Legislature's decision to

18  excise M'Naghten's test for cognitive capacity from the statute defining legal insanity in that

19  state.  The Court rejected the Clark defendant's argument that "the side-by-side M'Naghten test

20  represents the minimum that a government must provide in recognizing an alternative to criminal

21  responsibility on grounds of mental illness or defect[.]"  Clark, 548 U.S. at 748.  It said "[h]istory

22  shows no deference to M'Naghten that could elevate its formula to the level of fundamental

23  principle, so as to limit the traditional recognition of a State's capacity to define crimes and

24  defenses."  Id. at 749.  Furthermore, said the Court, "no particular formulation has evolved into a

25  baseline for due process, and ... the insanity rule, like the conceptualization of criminal offenses,

26  is substantially open to state choice."  Id. at 752.

1    Petitioner's constitutional argument against the instruction comes in several

2    forms, but the essence of it rests on what he terms his "unique situation: where the statute fails to

3    correctly state the law."  Petitioner's Brief at 48 (emphasis added).  He concedes that "[i]n most

4    cases, instructing [the jury] in the literal statutory language is not a problem, because the

5    statutory language usually states the legal standard correctly and clearly."  Id. at 49.  But here, he

6    says, "instructing in the literal statutory language was erroneous because the M'Naghten

7    standard, as reiterated by California Supreme Court authority[,] must prevail over language in §

8    25(b) that is inconsistent with M'Naghten."  Id.  Petitioner asserts that "[a] trial court is obligated

9    to follow the [California] Supreme Court" when a statute and a California Supreme Court

10   decision conflict.  Id.  His argument, then, is as follows: the California Supreme Court has

11   declared that the traditional M'Naghten standard determines legal insanity in California;[21]

12   California Penal Code § 25(b) codifies a test of moral capacity different from M'Naghten;

13   therefore the trial court was constitutionally bound to give the jury the traditional M'Naghten

14   standard of moral capacity regardless of the wording of the applicable statute.

15        M'Naghten and § 25(b) do present a curious disconnect within California law, but

16   for AEDPA's purposes, it is an irrelevant one.  Section 2254(d)(1) focuses on purported

17   misapplications of federal law as established by the United States Supreme Court, not on state-

18   court confusion about the application of state law in an area that is "substantially open to state

19   choice."  Clark, supra.  Petitioner provides no authority, nor is this court aware of any, that would

20   support his proposition that a state trial court's failure to choose the precedent of a higher state

21   court over the literal wording of a state statute in formulating a jury instruction is

22

23        [21] See People v. Skinner, 39 Cal.3d 765, 777 (1985).  In Skinner, the California court was
     not presented with the argument at bar, that the moral capacity prong of § 25(b) codifies a
24   meaning of "right and wrong" more general than M'Naghten's act-specific moral capacity test.
     Nevertheless, the California Supreme Court declared that § 25(b) made California a M'Naghten
25   state.  See also People v. Kelly, 1 Cal.4th 495, 533 (1992) (describing the defendant's vagueness
     challenge to § 25(b) as "nothing less than a challenge to the M'Naghten test itself.... That test
26   passes constitutional muster").

1   unconstitutional per se.  In fact, petitioner supplies federal precedent that points in the opposite

2   direction.  In Williams v. Vasquez, 817 F.Supp. 1443 (E.D.Cal.1993),[22] this court stated that

3   > [a]lthough there is no constitutional right to a particular definition
> of insanity, once a state has established, within its rules of criminal
4   > procedure, that one definition of insanity must be used to the
> exclusion of another, due process protects a defendant's right to
5   > have the state follow its procedure and utilized the sanctioned
> definition.

6

7   Id. at 1480 (emphasis added) (citing, inter alia, Hicks v. Oklahoma, 447 U.S. 343, 346 (1980).  In

8   California, the state judiciary defers to "the original primacy of the Legislature in the field of

9   creating rules of criminal procedure[.]"  People v. Collie, 30 Cal.3d 43, 55 (1981).  The

10  "sanctioned definition" of insanity in this case, then, was the definition recorded in the California

11  Penal Code at the time petitioner committed the underlying offenses.  The trial court and the state

12  courts of review were not bound by state or federal law to choose the traditional M'Naghten

13  definition of moral capacity over the one sanctioned by § 25(b).

14  Finally, petitioner argues that he was prejudiced by the instruction's definition of

15  the M'Naghten moral capacity prong and that it "removed Petitioner's most promising defense,

16  thus raising his burden of proof."  Petitioner's Brief at 55.  He points out that the prosecutor

17  relied extensively on a criterion of right and wrong "in the abstract" in making the case that

18  petitioner was sane when he killed Mark Levitoff.  Dr. Howle testified to his initial opinion that

19  petitioner "met the criteria for insanity under M'Naghten, meaning that as a result of mental

20  disease or defect, he was not able to appreciate the nature and quality of what he was doing and

21  was not able to appreciate the wrongfulness of what he was doing."  RT 2:448.  However, while

22  still on direct examination by defense counsel, Dr. Howle conceded that the moral capacity

23  definition being used at trial was

24  > a little bit confusing to me because I think it can be interpreted in a
> variety of ways.  I do not believe that he understood what he was
25

26  [22] Cited in petitioner's reply at 10.

46

1               doing was wrong. ... I do believe that at the time he probably was
in a position to know legal – what was legally right and wrong and
2               probably knew what was wrong in the abstract sense.

3 Id. at 2:448-49.  The prosecutor returned to this aspect of Dr. Howle's opinion on cross-

4 examination and framed it under the more general definition of moral incapacity afforded him

5 under § 25(b).  There followed a long and confusing exchange between the prosecutor and Dr.

6 Howle, interrupted by objections from defense counsel and queries for clarification from the

7 bench, about what, exactly, the standard for moral capacity under M'Naghten was and whether it

8 changed Dr. Howle's opinion.  See RT 2:461-71.  In the middle of that exchange, Dr. Howle told

9 the prosecutor that "the M'Naghten definition is different than what you're describing."  Id. at

10 2:467.

11          Dr. Howle's testimony supports petitioner's contention that the Penal Code's

12 "abstract" definition of moral incapacity was significant in his trial and not in his favor.  But,

13 because the instruction's definition of insanity did not assert an unconstitutional standard, it

14 could only be found constitutionally deficient if it was so ambiguous as to have prevented, within

15 a reasonable likelihood, the jury's consideration of "constitutionally relevant evidence."  Boyde,

16 supra.  Petitioner has not shown it was reasonably likely that the instruction did that.  It is true

17 that Dr. Howle himself found the wording of the moral capacity prong "confusing," but he made

18 it just as clear that he thought petitioner was legally insane when he killed Mark Levitoff because

19 "he was not able to appreciate the nature and quality of what he was doing" – that is, that

20 petitioner was legally insane under M'Naghten's definition of cognitive capacity too.  The jury

21 heard that opinion, as it did the opinion of Dr. Globus, who agreed with Dr. Howle that the

22 cognitive capacity criteria "clearly fits."  RT 3:691.  The fact that California's generalized

23 definition of moral capacity might not have conformed with the evidence petitioner presented in

24 favor of insanity does not give rise to a reasonable likelihood that constitutionally relevant

25 evidence was excluded, nor did it make his burden to prove insanity by a preponderance of that

26 evidence unconstitutionally heavier.

1    The court finds there was nothing constitutionally "ailing," as Estelle and

2  Middleton put it, in CALJIC 4.00 as it was given at petitioner's trial, nor, therefore, was the

3  Court of Appeal's decision an unreasonable application of clearly established federal law.  This

4  claim should be denied.

5    VII.   Conclusion

6    The state courts did not make unreasonable determinations of fact on whether

7  there was substantial evidence creating a genuine doubt as to petitioner's competence to enter a

8  guilty plea and to stand trial on the question of his sanity.  Petitioner therefore should be denied

9  relief on his procedural incompetency claim.  28 U.S.C. §§ 2254(d)(2).

10    Likewise, petitioner's claim that the trial court gave an unconstitutional jury

11   instruction on his insanity defense is barred under 28 U.S.C. § 2254(d).  It too should be denied.

12    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

13  habeas relief be denied and this case dismissed.

14    These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

16  days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

19  may address whether a certificate of appealability should issue in the event he files an appeal of

20  the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

21  court must issue or deny a certificate of appealability when it enters a final order adverse to the

22  applicant).  Any response to the objections shall be served and filed within fourteen days after

23  /////

24  /////

25  /////

26  /////

1  service of the objections.  The parties are advised that failure to file objections within the

2  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

3  F.2d 1153 (9th Cir. 1991).

4   Dated: June 12, 2013

5

6                                                    CAROLYN K. DELANEY
                                                      UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26